SOUTHERN UTAH WILDERNESS
ALLIANCE, a nonprofit
corporation, Plaintiff,

v.

Walt DABNEY, in his official capacity as superintendent of Canyonlands National Park; Joseph Alston, in his official capacity as superintendent of Glen National Recreation Area; John Cook in his official capacity as Regional Director; and the National Park Service, Defendants,

and

The Utah Trail Machine Association; the Blue Ribbon Coalition; the High Desert Multiple Use Coalition; the United Four Wheel Drive Associations of U.S. & Canada; and the Historic Access Recovery Project, Defendant–Intervenors.

No. 2:95 CV 559 K.

United States District Court,
D. Utah,
Central Division.

June 19, 1998.

Heidi J. McIntosh, Southern Utah Wilderness Alliance, Salt Lake City, for Southern Utah Wilderness Alliance.

Stephen L. Roth, U.S. Attorney's Office, UT, for Walt Dabney, Joseph Alston, John Cook.

Hal J. Pos, Parsons Behle & Latimer, Salt Lake City, UT, William Perry Pendley, Steven J. Lechner, Mountain States Legal Foundation, Denver, CO, for Utah Trail Machine Association, Blue Ribbon Coalition, High Desert Multiple Use Coalition, United Four Wheel Drive Associations of U.S. & Canada, Historic Access Recovery Project.

## MEMORANDUM DECISION AND ORDER

KIMBALL, District Judge.

Plaintiff Southern Utah Wilderness Alliance filed this action against the National Park Service challenging the Park Service's decision to implement a Backcountry Management Plan in Canyonlands National Park and the Orange Cliffs Unit of Glen Canyon National Recreation Area. The Utah Trail Machine Association, in conjunction with several similarly interested organizations, intervened as defendants. Now under consideration are Plaintiff's motion for summary judgment and the Park Service's cross motion for summary judgment.[1]

---

1. Defendant–Intervenors assert that district courts are prohibited from ruling on motions for summary judgment in cases involving judicial review of agency action, citing *Olenhouse v. Commodity Credit Corp.*, 42 F.3d 1560 (10th Cir. 1994). *Olenhouse* does not foreclose this Court's resolution of the parties' motions for summary judgment in the circumstances present here.

In *Olenhouse*, the district court treated the plaintiffs' appeal of an agency decision as a "separate and independent action," subject "to discovery and a 'pretrial' motions practice." *Id.* at 1579. The agency then sought summary review of the plaintiffs' appeal by filing a "motion to affirm agency action," which was postured as a

motion for summary judgment. *Id.* In ruling on the agency's motion, the district court relied on "arguments, documents, and other evidence outside of the administrative record." *Id.* On appeal, the Tenth Circuit condemned the use of such procedures on the ground that they are inconsistent with the standards for judicial review of agency action under the Administrative Procedure Act inasmuch as they invite (even require) the reviewing court to rely on evidence outside of the administrative record. *Id.* at 1579–80.

Under *Olenhouse*, the *procedures* employed by the district court are determinative—not the parties' characterization of their motions. At oral

## BACKGROUND

The Backcounty Management Plan ("BMP") at issue continues the Park Service's previous policy of allowing the use of four-wheel-drive vehicles on rough jeep tracks or trails traversing Canyonlands National Park and portions of the adjoining Glen Canyon National Recreation Area. The present controversy concerns such trails in Salt Creek Canyon, Horse Canyon, and Lavender Canyon (the "Canyons").[2] Beyond certain points, these trails are passable only in a high clearance four-wheel-drive vehicle operated by an experienced driver.

### The Canyons

Salt Creek and Horse Canyons compose the majority of the Salt Creek Archeological District. Salt Creek is the only year-round, fresh water creek in the Park other than the Colorado and Green Rivers. The Salt Creek Jeep Trail[3] runs in and out of Salt Creek. In fact, at various points, the trail's path is itself the creek bed. There is no practical way to reroute the trail to keep it out of the water course. In the years preceding the BMP's development, the Park Service had received numerous requests for assistance in removing vehicles that had broken down or become stuck in the trail. Instances where vehicles lost transmission, engine, or crankcase fluids in the water also occurred several times a year.

Rivers and their banks are very rare and important to the desert ecology. Such riparian areas support plant, aquatic, and animal life forms that are not found elsewhere. When disturbed, the areas are slow to, or do not, recover with native vegetation. The riparian areas in Salt Creek Canyon suffered greatly from this vehicle use. At the same time, the Salt Creek Jeep Trail is the only means of vehicular access to Angel Arch, a well-known landmark and popular destination among four-wheel drivers.

A trail in the adjacent Horse Canyon is the only means of vehicular access to another popular destination, Tower Ruin. Like the trail in Salt Creek, the trail in Horse Canyon is passable only by four-wheel-drive vehicles. The trail follows the canyon's dry wash bottom. While riparian habitat is not of concern, the presence of vehicles and vehicle passengers jeopardize Horse Canyon's pristine archeological resources, which include ancient Native American ruins. Such resources have diminished value once disturbed or altered.

Jeep trails also traverse two other areas with exceptional natural and cultural features, Lavender Canyon and Davis Canyon. Vehicles endangered these canyons because they were constantly driven beyond the trails' ends, effectively elongating the trails, and because vehicle passengers constantly camped in violation of regulations. Under the Park Service's then-current policy, vehicle use of the trails was unrestricted.

### Development of the BMP

The Park Service determined to develop and implement the BMP to address dramatic increases in the numbers of people visiting the area. Work began in the summer of 1992. In the scoping phase, the Park Service identified the problems and issues to be addressed in the BMP, actively soliciting public input through a variety of means, including publication of a Notice of Intent to Prepare the BMP in the *Federal Register*.

argument in this case, the parties agreed that the memoranda submitted in support of their motions are equivalent to and are to be treated by this Court as appellate briefs, subject to the standards of review set forward in the Administrative Procedure Act and discussed *infra*.

This Court did not consider arguments, documents, or evidence outside of the administrative record. Plaintiff moved to strike the Declaration of Walt Dabney, Superintendent of Canyonlands National Park, submitted by the Park Service in support of its cross motion. Plaintiff's motion was granted at oral argument to the extent the declaration presented arguments and information that were not presented in the administrative record.

2. The BMP applies to areas of both a national park and a national recreation area. However, each is subject to unique legal mandates. Salt Creek Canyon and Horse Canyon are physically located within the boundaries of Canyonlands National Park, and the analysis will proceed as if the BMP applied only to a national park when the discussion applies only to those two Canyons. Portions of Lavender Canyon extend into Glen National Recreation Area. Both areas are referred to herein as "Canyonlands" or the "Park."

3. As denominated by Park Service signage.

Thirty-eight issues were identified in this phase, including impacts from aircraft over-flights, rock climbing, bicycles, saddle and pack stock, and vehicles. Much discussion arose over the balance to be struck between public demand for vehicular access and public demand for preservation of the riparian and cultural resources in Salt Creek and Horse Canyons.

In the fall of 1992, the Park Service issued a newsletter, discussing the planning process to date and soliciting possible solutions to the 38 issues, as well as assistance in identifying additional issues. During December 1992 and January 1993, the Park Service hosted public discussions in a variety of locations in Utah and Colorado.

### The Environmental Assessment

Between February 1993 and December 1993, a committee of park employees developed a draft plan or environmental assessment, which was released to the public on December 18th. The draft ("EA")[4] described the Park's current policies, alternatives for change, and the environmental consequences of the alternatives described, including the alternative of taking no action. The EA identified the Park Service's preferred alternative for each problem. If a near consensus of respondents suggested one alternative over another, and if that alternative met with Park Service mandates and policies, then public preference determined the preferred alternative.

With respect to the trails, the preferred alternative was to close the Salt Creek Canyon to vehicles after a particular landmark, Peekaboo Spring, leaving 10 miles to be traversed by foot before reaching Angel Arch. To prevent a corresponding increase in the use of Horse Canyon and to protect its archeological resources, vehicle access beyond Tower Ruin would be by guided tour only. Alternative A was the same except with earlier closure points. Alternative B would close both canyons to vehicles, but allow guided tour vehicles in Horse Canyon. Alternative C would simply close both canyons. Under the preferred alternative, 14.25 miles of un-

paved road would be closed, reducing the approximate total in Canyonlands from 194 to 179.25.

The preferred alternative for Davis and Lavender Canyons was to leave them open—the no action alternative. The second alternative was to close them both.

The EA also listed alternatives recommended by public comment that were considered but rejected. These included closing all the roads in the planning area, which was rejected as unworkable "due to the popularity of vehicle camping and use," and limiting use by implementation of a permit system, which was rejected as cost prohibitive and overly restrictive.

Over 2000 copies of the draft were distributed to the public. The ensuing review period lasted until March 5, 1994. During that time, the Park Service held numerous public meetings, including meetings with a wide range of special interest groups.

In a briefing statement prepared shortly after the meetings' concluded, the Park Service noted the emergence of major controversy with respect to three proposals—those imposing group size limits, placing restrictions on rock climbing, and closing roads. With respect to the latter, the Park Service noted that "the proposal to close any road has touched a nerve in the four-wheel-drive community."

### The Final BMP

The final BMP[5] was released on January 6, 1995. The BMP adopts a zoning system, dividing the planning area into 19 zones defined with reference to the fragility and uniqueness of the natural resources located within the zone. Visitor use within each zone is permitted accordingly. The trails in the Canyons were to remain open to vehicle traffic, but access would be limited to those obtaining permits. Twenty-four vehicles per day would be allowed into the Salt and Horse Canyon zone; ten per day would be allowed into the Lavender Canyon zone. A one-half mile segment of the Salt Creek Jeep Trail

---

4. Titled "Canyonlands National Park and Orange Cliffs Unit of Glen Canyon National Recreation Area Environmental Assessment for Backcountry Management Plan."

5. Titled "Canyonlands National Park and Orange Cliffs Unit of Glen Canyon National Recreation Backcountry Management Plan."

would be closed, as well as approximately seven miles elsewhere in the planning area, including the trail within Davis Canyon, which is three miles long.

### Plaintiff's Action

Plaintiff alleges the Park Service violated the Administrative Procedure Act ("APA") in implementing the BMP in violation of agency regulations, the National Park Service Act, and the National Environmental Policy Act ("NEPA"), and in adopting the permit system without having a rational basis for doing so.

### STANDARD OF REVIEW

■ The APA sets forth the standard of review to be applied by courts in reviewing agency actions challenged thereunder. Among other things, the APA directs reviewing courts to hold unlawful and set aside agency action found to be "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." *5 U.S.C. § 706(2)(A)*. "Generally, an agency decision will be considered arbitrary and capricious if 'the agency had relied on factors which Congress had not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise.'" *Friends of the Bow v. Thompson,* 124 F.3d 1210, 1215 (10th Cir.1997) *(quoting Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.,* 463 U.S. 29, 43, 103 S.Ct. 2856, 2866, 77 L.Ed.2d 443 (1983)).

### DISCUSSION

Plaintiff's claims are considered in turn.

**1. Agency Regulations—Executive Order 11644.**

Plaintiff first claims the Park Service's decision was not in accordance with Park Service regulations prohibiting the designation of off-road vehicle routes within national parks. Plaintiff's argument is based on Executive Order 11644, *37 Fed.Reg. 2887 (Feb. 9, 1972),* which mandates restrictions on off-road vehicles when their use results in environmental damage.

The Order is intended to "ensure that the use of off-road vehicles on public lands will be controlled and directed so as to protect the resources of those lands." *Id. at Sec. 1.* The Order directs agency heads with stewardship over public lands to promulgate regulations providing for the "administrative designation of the specific areas and trails on public lands on which the use of off-road vehicles may be permitted, and areas in which the use of off-road vehicles may not be permitted." *Id. at Sec. 3(a).*

The Order directs further that the regulations must require the designation of such areas in accordance with certain listed directives, including a directive providing that areas and trails shall not be located in national parks unless the agency head "determines that off-road vehicle use in such locations will not adversely affect their natural, aesthetic, or scenic values." *Id. at Sec. 3(a)(4).*

■ In accordance with the Order, the Park Service promulgated the following regulation:

§ 4.10 **Travel on park roads and designated routes.**

(a) Operating a motor vehicle is prohibited except on park roads, in parking areas and on routes and areas designated for off-road vehicle use.

(b) Routes and areas designated for off-road vehicle use shall be promulgated as special regulations. The designation of routes and areas shall comply with § 1.5 of this chapter and E.O. 11644 (37 FR 2887). Routes and areas may be designated only in national recreation areas, national seashores, national lakeshores and national preserves.

*36 C.F.R. § 4.10(b).* The heart of the controversy here lies in the question of whether the jeep trails in the Canyons are routes designated for off-road vehicle use, which are prohibited in national parks, or park roads, upon which motor vehicles may travel.

"Park roads" are not defined in the regulation. Park Service management policies concerning park roads exist, but are not helpful here. A 1988 policy guide states that park

roads should be well constructed, but also acknowledges that some existing roads are cultural and recreational resources that should be preserved even though they may *not meet current engineering standards.*

"Off-road vehicle routes" are not defined either. Defendant–Intervenors argue that the trails cannot be such routes because the Park Service has never so designated them.[6] However, the question is whether the trails are subject to Executive Order 11644, which effectively prohibits off-road vehicle use in the absence of such a designation by requiring agency heads to *affirmatively* designate the locations where off-road vehicles may be used.

The Park Service asserts that the Park Service has never considered the trails to be subject to Executive Order 11644, as "evidenced by the fact that the Park has continued to operate the backcountry four-wheel drive road system largely in its present form since the Park's creation in 1964, without any change in response to either the Executive Order or the regulations." The Park Service argues that this belief constitutes its interpretation of a regulatory scheme entrusted to its administration, and, as such, is entitled to great deference.

An agency's administrative interpretation of its own regulations is "of controlling weight unless it is plainly erroneous or inconsistent with the regulation." *Bowles v. Seminole Rock Co.,* 325 U.S. 410, 414, 65 S.Ct. 1215, 1217, 89 L.Ed. 1700 (1945). Leaving aside this Court's doubts as to whether the Park Service's failure directly to respond to the Order and its implementing regulations can be construed as evidence that the agency considered the Order and determined that it did not apply to the jeep trails in the Canyons, this Court does not find that the interpretation of the regulation to exclude roads providing access and circulation within the Park is plainly erroneous or inconsistent with the Order.

The Order's preamble states that the need for the Order arose because off-road vehicle use was occurring on public lands without agencies ever considering whether such use was consistent with wise land and resource management practices. The record reflects here that vehicle use in the Canyons has been considered. Park Service management policies require park access and circulation systems to be identified in general management plans. The backcountry roads, including the jeep trails in the Canyons, are identified in the Park's 1978 General Management Plan. Moreover, vehicle use in the Canyons was extensively considered in the preparation of the BMP at issue in this lawsuit.

Summary judgment is, accordingly, granted to Defendant with respect to Plaintiff's first cause of action.[7]

### 2. The National Park Service Organic Act.

Plaintiff also claims that the Park Service's decision to permit ORV use violates the 1916 National Park Service Organic Act, as amended by the 1978 "Redwoods Amendments." The relevant provision of the Organic Act provides that the Park Service is to "regulate the use" of national parks by means that conform to their "fundamental purpose," namely:

> to conserve the scenery and natural historic objects and the wildlife therein and to provide for the enjoyment of the same in such manner and by such means as will leave them unimpaired for the enjoyment of future generations.

---

6. Among other things, Defendant–Intervenors argue that the Park Service did not "designate" the trails inasmuch as the existence of the trails predates the existence of the park. The trails' prior use is not determinative because, as the preamble makes clear, the Order arose out of a demonstrated need for a unified federal policy towards the use of such vehicles.

Moreover, the manner in which the trails were used prior to the creation of the park is particularly irrelevant. The creation of the park in and of itself indicates that the area is to be afforded greater protection than may have existed before.

7. Finding that the Park Service's interpretation is not inconsistent with the regulation, however, does not necessarily mean that the decision of the Park Service to allow vehicles in the Canyons is lawful. As discussed below, and as the Supreme Court acknowledged in *Bowles,* the "legality of the result reached by this process, of course, is quite a different matter." 325 U.S. at 415, 65 S.Ct. at 1217.

*16 U.S.C. § 1.* A provision added in 1978 prohibits the authorization of activities that derogate park values:

> The authorization of activities shall be construed and the protection, management, and administration of these areas shall be conducted in light of the high public value and integrity of the National Park System and shall not be exercised in derogation of the values and purposes for which these various areas have been established, except as may have been or shall be directly and specifically provided by Congress.

*16 U.S.C. § 1a–1.*

The enabling legislation creating Canyonlands National Park identifies that park's unique values and purposes. That legislation provides:

> "In order to preserve an area in the State of Utah possessing superlative scenic, scientific, and archaeologic features for the inspiration, benefit, and use of the public, there is hereby established the Canyonlands National Park . . . ."

*16 U.S.C. § 271.* That legislation also mandates that Canyonlands be administered, protected, and developed in accordance with the purposes of the National Park Service Organic Act. *16 U.S.C. § 271(d).*

Plaintiff argues that these provisions focus exclusively on preservation and mandate the protection of park resources against "any impairments." The Park Service argues that they authorize a balancing between competing mandates of resource conservation and visitor enjoyment. The Park Service argues its decision represents a reasonable accommodation of conflicting mandates that is to be afforded considerable deference.

The Supreme Court has established a two-part process for reviewing an agency's construction of a statute that it administers:

> First, always, is the question whether Congress has directly spoken to the precise question at issue. If the intent of Congress is clear, that is the end of the matter; for the court, as well the agency, must give effect to the unambiguously expressed intent of Congress. If, however, the court determines Congress has not directly addressed the precise question at issue, the court does not simply impose its own construction on the statute, as would be neces-

sary in the absence of an administrative interpretation. Rather, if the statute is silent or ambiguous with respect to the specific issue, the question for the court is whether the agency's answer is based on a permissible construction of the statute.

*Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc.,* 467 U.S. 837, 842–43, 104 S.Ct. 2778, 2781–82, 81 L.Ed.2d 694 (1984). Any reasonable accommodation of conflicting mandates is permissible, "unless it appears from the statute or its legislative history that the accommodation is not one that Congress would have sanctioned." *Chevron,* 467 U.S. at 845, 104 S.Ct. at 2783 *(quoting United States v. Shimer,* 367 U.S. 374, 383, 81 S.Ct. 1554, 1560–61, 6 L.Ed.2d 908 (1961)).

■ With respect to Salt Creek Canyon beyond Peekaboo Spring, the first *Chevron* inquiry is determinative. Congress has issued a clear answer to the question of whether the Park Service is authorized to permit activities within national parks that permanently impair unique park resources. The answer is no. As set out in the statutes discussed above, the Park Service's mandate is to permit forms of enjoyment and access that are *consistent* with preservation and *inconsistent* with significant, permanent impairment.

Continued use of vehicles on the Salt Creek Jeep Trial beyond Peekaboo Spring is inconsistent with this clear legislative directive. The administrative record shows both that the riparian areas in Salt Creek Canyon are unique and that the effects of vehicular traffic beyond Peekaboo Spring are inherently and fundamentally inimical to their continued existence. The presence of the jeep trails eliminates areas that would otherwise support rare riparian vegetation and provide a rare habitat for a diverse array of small mammals and birds. Driving vehicles through the water kills aquatic species by increasing turbidity, churning pool bottoms, breaking down banks, and decreasing fish habitat. These are some of the grounds upon which the Park Service defended its selection of closure as the preferred alternative in the initial EA. There is nothing in the

administrative record to show that its earlier position was overstated or otherwise in error.

The administrative record reflects that the Park Service adopted the permit system instead of the pedestrian-access alternative solely because of the popularity of four-wheel-drive travel. However, "visitor enjoyment" as used in the statute refers to visitor enjoyment of park scenery, wildlife, and natural and historic objects that are to be preserved. As used in this sense, visitor enjoyment does not refer to visitor enjoyment of outdoor recreational activities. Opportunities for outdoor recreation are provided on lands managed by the Bureau of Land Management and the Forest Service.

Given the uniqueness of its riparian areas and the availability of less-invasive forms of access, permanent impairment of Salt Creek Canyon in order to permit the continued use of four-wheel-drive vehicles beyond Peek-a-boo Spring cannot be reconciled with the Organic Act's overarching goal of resource protection.[8]

■ With respect to Horse and Lavender Canyons and Salt Creek Canyon before Peekaboo Spring, the second *Chevron* inquiry must be undertaken. Congress has not specified the proportional weight to be given resource protection relative to visitor enjoyment with respect to a form of access that does not permanently impair a unique park resource. Accordingly, the question is whether the vehicle use as authorized in the BMP represents a reasonable accommodation of competing interests. This Court is satisfied that it does. With respect to those areas, the record does not reflect that unique resources will be impaired by vehicle travel or that the Park Service otherwise exceeded its administrative discretion. Although there are riparian areas in Salt Creek Canyon before Peekaboo Spring, the administrative record reflects both that routing the trail away from the creek may be possible and that the impacts from vehicle use are not as severe as they are farther down the trail.

Therefore, summary judgment is granted to Plaintiff on its fourth cause of action with respect to the use of vehicles in Salt Creek

Canyon beyond Peekaboo Spring. With respect to the remainder of Plaintiff's fourth cause of action, summary judgment is granted to Defendants.

### 3. The National Environmental Policy Act.

Plaintiff claims the Park Services' decision to permit vehicle use pursuant to the BMP violates NEPA. Specifically, Plaintiff claims that the EA prepared by the Park Service prior to adopting the BMP is legally insufficient to support the Park Service's finding that implementation of the BMP would have no significant environmental impact because the Park Service: (i) failed to consider an adequate range of alternatives by failing to discuss the alternative of closing many or all of the backcountry roads in the planning area, (ii) failed to discuss the permit system that was eventually adopted, and (iii) failed to adequately analyze the impacts of off-road vehicle use in areas other than in the Canyons.

NEPA requires federal agencies to prepare detailed statements of the environmental impacts of any major action they propose to undertake that will significantly affect the human environment. *See 42 U.S.C. § 4332.* If an agency is uncertain whether an action will have such an effect, the agency first prepares an EA. *See 40 C.F.R.. § 1501.3.* Through the mechanism of the EA, the agency reviews the environmental consequences of a proposed action in sufficient depth to determine whether preparation of the more detailed environmental impact statement ("EIS") is necessary. If the agency finds that the proposed action will not significantly impact the environment (a "FONSI"), the agency need not prepare an EIS. *See Park County Resource Council, Inc., v. U.S. Dep't of Agriculture,* 817 F.2d 609, 621 (10th Cir. 1987).

### a. Standard of Review.

■ "An agency's decision to issue a FONSI and not prepare an EIS is a factual determination which implicates agency ex-

---

8. Although this Court is not free to ignore the legislative mandates it is charged with applying, this Court has much sympathy for the elderly,

disabled, and others whose physical condition will not permit them to hike to Angel Arch.

pertise and accordingly, is reviewed under the deferential arbitrary and capricious standard of review." *Committee to Preserve Boomer Lake Park v. DOT,* 4 F.3d 1543, 1555 (10th Cir.1993). In determining whether an agency's issuance of a FONSI was arbitrary and capricious, reviewing courts must consider: (i) whether the agency's decision was based on a consideration of the relevant factors, and (ii) whether there has been a clear error in judgment. *Id.* The burden is on the plaintiff to establish that the agency's decision should not be upheld. *Id.*

### b. Range of Alternatives Addressed.

NEPA requires federal agencies to "study, develop, and describe appropriate alternatives to recommended courses of action in any proposal which involves unresolved conflicts concerning alternative uses of available resources." *42 U.S.C. § 4332(E) (1994).* Plaintiff claims that the Park Service failed to comply with this mandate because none of the alternatives presented in the EA involved significant road closures relative to the total number of miles of backcountry roads in the planning area. The total is over 200 miles, but none of the alternatives closed more than 14.

■ NEPA does not directly specify the range of alternatives that must be studied, which is a matter left to the agency's discretion. *See Olmsted Citizens for a Better Community v. United States,* 793 F.2d 201, 208–210 (8th Cir.1986) *(discussing factors affecting appropriate range of alternatives).* "Judicial review of the range of alternatives considered by an agency is governed by a rule of reason that requires an agency to set forth only those alternatives necessary to permit a reasoned choice." *California v. Block,* 690 F.2d 753, 767 (9th Cir.1982) *(internal quotation marks and citation omitted).* "As with the standard employed to evaluate the detail that NEPA requires in discussing a decision's environmental consequences, the touchstone for our inquiry is whether an [EA's] selection and discussion of alternatives fosters informed decision-making and informed public participation." *Id.*

■ Plaintiff argues that the Park Service should have considered a broader range of closure alternatives, ranging from closing all

the roads to closing none of the roads, and that the Park Service's decision to consider only alternatives that maximized vehicle use is insupportable in light of the National Park Service Organic Act's directive to "encourag[e] the use of transportation modes other than personal motor vehicles." *16 U.S.C. § 2301.*

This Court cannot say that the range of alternatives considered in the EA prevented an informed discussion, especially in light of the BMP's purpose to address the incremental impact of increased visitation. The Park Service focused on alternatives that were responsive to the problems identified as most critical in the scoping process, and, with respect to those problems, the Park Service did consider a full range of alternatives, including complete closure.

Moreover, the administrative record reflects that the issues raised in the ensuing public meetings were not limited to matters unique to the Canyons, but extended to general questions such as the appropriate balance to be struck between access and preservation and the propriety of motor vehicle use within national parks. In terms of the perspectives shared and the positions advanced, it is not clear that the debate would have been considerably richer or different if the EA had included the alternative of closing all of the backcountry roads.

### c. Failure to Analyze the Adopted Alternative in the EA.

Plaintiff next claims that the Park Service violated NEPA and thwarted its primary purpose of subjecting proposed actions to public debate and scrutiny before their final implementation by adopting an alternative that was not presented in the EA. Plaintiff is especially troubled by the Park Service's adoption of an alternative that was explicitly rejected in the EA, as is this Court.

■ The public comment process to be followed by an agency in its preparation of an EA is not prescribed by law. Agencies are merely directed to "involve ... the public to the extent practicable." *40 C.F.R. § 1501.4(b).* However, to be consistent with NEPA's purpose, the alternatives selected

"should serve both to alert the public of what the agency intends to do . and to give the public enough information to be able to participate intelligently in the process." *California v. Block,* 690 F.2d 753, 772 (9th Cir. 1982). Even under the exacting requirements applicable to the preparation of an EIS, an agency obviously must be allowed "some flexibility to modify alternatives canvassed in the draft EIS to reflect public input." *Id.* at 771.

Applying these principles in conjunction with the APA's deferential standard of review, this Court cannot conclude that the Park Service's failure to include the permit system as an alternative in the EA violated NEPA. The continued presence of vehicles in the Canyons was contemplated both by the no-action alternative and by several alternatives permitting guided tours. And again, public debate over the alternatives was sufficiently broad to apprise the Park Service of the various public perspectives.

### d. Failure to Analyze the Impacts of Off–Road Vehicle Use in Other Areas.

██ Finally, Plaintiff claims that the Park Service's FONSI lacks an adequate basis inasmuch as the Park Service failed to examine the impacts of vehicle use in the planning area other than in the Canyons. However, to assert such a claim, the plaintiff must submit at least some evidence that would justify a finding that the BMP might have significant environmental effects not already considered in the EA. *Provo River Coalition v. Pena,* 925 F.Supp. 1518, 1528 (D.Utah 1996) *(discussing issue in context of motion for preliminary injunction).* Speculation about adverse environmental effects is insufficient. *See Boomer Lake,* 4 F.3d at 1556 *(upholding FONSI against claim that agency failed to adequately examine project's adverse environmental effects).* Plaintiff has not done so here.

### e. Conclusion.

The Park Service considered the appropriate factors and did not make a clear error in judgment. Accordingly, its FONSI is not arbitrary and capricious. Defendants' motion for summary judgment is, therefore, granted with respect to Plaintiff's second and third causes of action.

### 4. Adequacy of Basis for Plan's Adoption.

Plaintiff also claims that the Park Service's decision to adopt the BMP lacks a reasonable factual foundation and is, accordingly, arbitrary and capricious. As this Court found in Section 2, *supra,* the decision of the Park Service represents a reasonable accommodation between competing mandates except with regard to Salt Creek Canyon beyond Peekaboo Spring, where vehicle use violates the National Park Service Organic Act.

Accordingly, Defendants' motion for summary judgment with respect to Plaintiff's fifth cause of action is granted.

### CONCLUSION

The parties' motions for summary judgment are granted to the extent and for the reasons set forth above.[9]

---

**9.** The Park Service filed a motion to stay any decision on Plaintiff's request for injunctive relief until after the Court decided the merits of the parties' cross motions. That motion was granted at oral argument, leaving the issue of remedies to be decided in a separate proceeding. If Plaintiff seeks further relief, Plaintiff shall file and serve on Defendants a statement of the remedies sought and the basis therefore by July 15, 1998. Defendants shall file any response within 10 days after service of the statement; Plaintiff shall file any reply within 10 days after service of Defendants' response.