SOUTHERN UTAH WILDERNESS ALLIANCE and the Sierra Club, Plaintiffs,

v.

BUREAU OF LAND MANAGEMENT; San Juan County, Utah, Ty Lewis, San Juan County Commissioner; Kane County, Utah; Garfield County, Utah Defendants.

No. 2:96–CV–836C.

United States District Court, D. Utah, Central Division.

June 25, 2001.

Robert B. Wiygul, Earthjustice Legal Defense Fund, Denver, CO, Heidi J. McIntosh, Southern Utah Wilderness Alliance,

Salt Lake City, UT, Jerome L. Epstein, Elena Nicole Broder, Elizabeth Appel Blue, Jenner & Block, Washington, DC, for Southern Utah Wilderness Alliance.

Jill N. Parrish, Bill Ryan, Stephen J. Sorenson, Daniel D. Price, Jeannette F. Swent, U.S. Atty's Office, Washington, DC, for U.S., Bureau of Land Management, U.S. Dept. of Interior.

Stephen G. Boyden, Utah Atty General's Office, Salt Lake City, UT, for State of Utah, Utah School and Institutional Trust Lands Admin.

Allen K. Young, Young, Kester & Petro, Springville, UT for Robert G. Reeves, James W. Reeves, Ross E. Brannian.

Ronald W. Thompson, Stephen H. Urquhart, Thompson Awerkamp & Urquhart LC, St. George, UT, Craig C. Halls, San Juan County Atty,

Ronald W. Thompson, Stephen H. Urquhart, Elizabeth B. Grimshaw, Thompson Awerkamp & Urquhart LC, St. George, UT, Craig C. Halls, San Juan County Atty, Monticello, UT, for San Juan County.

Eric D. Petersen, Washington County Atty's Office, St. George, UT, Colin R. Winchester, Kane County Atty, Kanab, UT, for Norman Carroll, Joe Judd, Stephen Crosby.

Wallace A. Lee, Garfield County Atty., Panguitch, UT, Ronald W. Thompson, Stephen H. Urquhart, Barbara G. Hjelle, Thompson Awerkamp & Urquhart LC, St. George, UT, for Louise Liston, D. Maloy Dodds, Clare M. Ramsay, Garfield County.

## ORDER

CAMPBELL, District Judge.

This matter is before the court on Plaintiffs Southern Utah Wilderness Alliance and The Sierra Club's (hereinafter "Plaintiffs") motion for summary judgment.[1]

1. As explained below, however, the court treats this motion as a review of informal

Plaintiffs seek declaratory and injunctive relief barring further road construction[2] by Defendants San Juan County, Kane County, and Garfield County (hereinafter "the Counties") across federal Bureau of Land Management (hereinafter "BLM") land in southern Utah. The Counties contend that they have previously perfected rights-of-way in those areas and are thus legally entitled to build the roads. The facts are set forth in the parties' pleadings and will not be repeated except as necessary to explain the court's decision. For the reasons set forth below, the court GRANTS Plaintiffs' motion for summary judgment.

## I. R.S. 2477

The Counties assert that they have perfected rights-of-way across the disputed areas in accordance with Revised Statute 2477 ("R.S.2477"). R.S. 2477, initially passed as part of the Mining Act of July 26, 1866, reads: "And be it further enacted, that the right of way for the construction of highways over public lands, not reserved for public uses, is hereby granted." 43 U.S.C. § 932 (repealed); R.S. 2477. "According to regulations written by the Department of the Interior and, after 1946, the Bureau of Land Management, a[n R.S. 2477] right-of-way could be obtained without application to, or approval by, the federal government." *Sierra Club v. Hodel,* 848 F.2d 1068, 1078 (10th Cir.1988), *overruled on other grounds, Village of Los Ranchos De Albuquerque v. Marsh,* 956 F.2d 970, 973 (10th Cir.1992). R.S. 2477 roads are "major components of the transportation systems in most western states." *Hodel,* 848 F.2d at 1078.

In 1976, Congress passed the Federal Land Policy Management Act ("FLPMA"). *See* 43 U.S.C. § 1763. FLPMA departs from the earlier policy of giving away federal lands in favor of a policy of sound management of federal lands. Since the passage of FLPMA, a right-of-way on federal land must be granted by the BLM, which must base its decision on considerations of "national and State land use policies, environmental quality, economic efficiency, national security, safety and good engineering and technological practices." 43 U.S.C. § 1763. Accordingly, FLPMA "repeals R.S. 2477 and its open-ended grant of rights-of-way over public lands while explicitly protecting R.S. 2477 rights-of-way in existence on the date of the FLPMA's passage." *Hodel,* 848 F.2d at 1078 (10th Cir.1988). R.S. 2477 rights-of-way which were perfected prior to 1976, therefore, are valid even after the repeal of R.S. 2477.

## II. Administrative Background

On May 11, 1998, the court ruled that the Counties' maintenance and use of legitimate R.S. 2477 rights-of-way would not constitute trespass onto federal lands. *See SUWA v. BLM,* No. 96–836, slip op. at 2–3 (D.Utah May 11, 1998) (Sam, J.). The court then stayed this case pending an administrative determination by the BLM as to the validity and scope of the claimed R.S. 2477 rights-of-way. (*See id.* at 3.)

The BLM proceeded to conduct an informal administrative adjudication. This informal adjudication began with a public notification process. The BLM then considered several forms of evidence, includ-

---

agency action, rather than as a motion for summary judgment. *See infra* at 1135.

**2.** Plaintiffs seek to enjoin construction on six roads in San Juan County (Claim 507, Claim 510, Claim 511, Claim 514, Claim 516, and

Claim 518), five roads in Kane County (Paria–Hackberry/SWAG, Burning Hills # 1, Burning Hills # 2, Burning Hills # 3, and Moquith Mountain claims), and four roads in Garfield County (Cedar Wash, Right Hand Collet, Devil's Garden, and Short Cut claims).

ing information submitted by the parties and the public, interviews, field inspections, maps, federal and local public land records, wilderness inventory records, BLM records, and aerial photographs. (See BLM R.S. 2477 Administrative Determination(s) for Garfield, San Juan, and Kane Counties (hereinafter "Admin. Determination") at Table of Contents, "Evidence Related to Construction and Highway".) Before reaching a decision, the BLM published notice of its draft determinations and accepted additional public comment. The BLM process did not, however, include a hearing featuring live testimony or cross-examination. On July 9, 1999, the BLM found that, with one exception (the Skutumpah Road in Kane County), the rights-of-way claimed by the Counties are not valid R.S. 2477 rights-of-way.

### III. Review of informal agency action

#### A. Standard of review

When an interested person objects to agency action made during an informal adjudication (one not conducted on the record after the opportunity for an agency hearing), the agency action is typically reviewed under an "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law" standard. *Friends of the Bow v. Thompson,* 124 F.3d 1210, 1215 (10th Cir.1997), *quoting* 5 U.S.C. § 706(2)(A). In determining whether the agency acted in an "arbitrary and capricious" manner, a reviewing court "must ensure that the agency 'decision was based on a consideration of the relevant factors' and examine 'whether there has been a clear error of judgment.'" *Friends of the Bow,* 124 F.3d at 1215, *quoting Citizens to Preserve Overton Park, Inc. v. Volpe,* 401 U.S. 402, 416, 91 S.Ct. 814, 28 L.Ed.2d 136 (1971). Generally, an agency decision will be considered arbitrary and capricious if

the agency had relied on factors which Congress had not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise.

*Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.,* 463 U.S. 29, 43, 103 S.Ct. 2856, 77 L.Ed.2d 443 (1983), *quoted in Friends of the Bow,* 124 F.3d at 1215; *accord Colorado Envtl. Coalition v. Dombeck,* 185 F.3d 1162, 1167 (10th Cir.1999).

In addition to requiring a reasoned basis for the agency's decision, "arbitrary and capricious" review requires that agency action be supported by facts found in the administrative record as a whole. *See Arkansas v. Oklahoma,* 503 U.S. 91, 108, 112 S.Ct. 1046, 117 L.Ed.2d 239 (1992), *cited in Koch v. United States Dept. of the Interior,* 47 F.3d 1015, 1018 (1995); *Olenhouse v. Commodity Credit Corp.,* 42 F.3d 1560, 1575 (10th Cir.1994). The Tenth Circuit has interpreted this as requiring that an agency action be supported by "substantial evidence." *Id.* "Evidence is substantial in the APA sense if it is 'enough to justify, if the trial were to a jury, a refusal to direct a verdict when the conclusion to be drawn is one of fact.'" *Id., quoting Illinois Central R.R. v. Norfolk & W. Ry.,* 385 U.S. 57, 66, 87 S.Ct. 255, 17 L.Ed.2d 162 (1966). "'Substantial evidence' is more than a mere scintilla; it must be such relevant evidence that a reasonable mind might accept as adequate to support a conclusion." *Olenhouse,* 42 F.3d at 1581. "Evidence is not substantial if it is overwhelmed by other evidence ... or if it constitutes mere conclusion." *Id.* (citations omitted). This "substantial evidence" standard does not replace the "arbitrary and capricious" standard, but merely describes the type of factual support for an agency decision required under "arbitrary and capricious" review. *See id.,* 42 F.3d at 1575.

*B. Review of agency's statutory interpretation*

In making its determination, the BLM relied on the Department of the Interior's ("DOI") statutory construction of R.S. 2477. The Counties dispute the BLM's interpretation and claim that the BLM erred in its statutory construction. The court must therefore review both the factual and the legal determinations of the BLM.

▮ When the question before the court involves an agency's interpretation of a statute it administers, the court typically utilizes the two-step approach announced in *Chevron U.S.A., Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984), which requires that, where the statute is silent or ambiguous with regards to the interpretation of disputed terms, the court should give deference to reasonable agency interpretations of the statute. *See id.* at 842–43, 104 S.Ct. 2778. Here, however, the DOI Secretary's statutory interpretation of R.S. 2477 appears in informal policy statements and opinion letters, rather than a formal rule or regulation. (*See* Letter from DOI Deputy Solicitor Frederick Ferguson to Assistant Attorney General James Moorman of April 28, 1980 (hereinafter "Ferguson Letter"), attached as Ex. 4 to Pls.' Mem. in Supp. of Mot. for Summ. J.) These types of interpretations, which are not subject to rigorous public notice and comment procedures, "do not warrant *Chevron*-style deference." *Christensen v. Harris County*, 529 U.S. 576, 586, 120 S.Ct. 1655, 146 L.Ed.2d 621 (2000) (holding that *Chevron* deference does not apply to statutory interpretation issued in agency opinion letter). "Instead, interpretations contained in [informal formats] are 'entitled to respect'[,] ... but only to the extent that those interpretations have the 'power to persuade.'" *Id., quoting Skidmore v. Swift & Co.*, 323 U.S. 134, 140, 65 S.Ct. 161, 89 L.Ed. 124 (1944); *accord Reno v. Koray*, 515 U.S. 50, 61, 115 S.Ct. 2021, 132 L.Ed.2d 46 (1995) (informal statutory interpretation by agency entitled to "some deference" so long as it is a permissible construction of the statute). "[T]he weight to be afforded non-binding agency interpretations 'will depend upon the thoroughness evident in its consideration, the validity of its reasoning, its consistency with earlier and later pronouncements, and all those factors which give it power to persuade, if lacking power to control.'" *United States v. 162 Megamania Gambling Devices*, 231 F.3d 713, 719 (10th Cir. 2000), *quoting Skidmore*, 323 U.S. at 140, 65 S.Ct. 161.

Accordingly, when reviewing the agency's factual determinations the court must ensure that the agency's determinations were not arbitrary and capricious. But when considering the legal interpretations of the agency, the court will give some deference to the agency interpretation of the statute.

*C. Procedural posture*

▮ "Reviews of agency action in the district courts must be processed *as appeals.*" *Olenhouse*, 42 F.3d at 1580 (emphasis in original). Although SUWA's motion is styled as a motion for summary judgment, the court will apply the rules and standards applicable to appeals of informal agency action rather than those applicable to motions for summary judgment. *See id.* "Under *Olenhouse*, the procedures employed by the district court are determinative—not the parties' characterization of their motions." *Southern Utah Wilderness Alliance v. Dabney*, 7 F.Supp.2d 1205, 1206 (D.Utah 1998), *rev'd on other grounds*, 222 F.3d 819 (10th Cir. 2000). A district court may review agency action on a motion styled by the parties as a motion for summary judgment, so long

as the court properly applies review procedures. *See Southern Utah Wilderness Alliance v. Dabney*, 222 F.3d 819, 824 (10th Cir.2000); *accord Girling Health Care, Inc. v. Shalala*, 85 F.3d 211, 215 (5th Cir. 1996); *Alexander v. Merit Sys. Protection Bd.*, 165 F.3d 474, 480 (6th Cir.1999).

■ The Counties insist that they are entitled to a trial de novo before the court, and that the BLM record is to be treated as nothing more than discovery evidence. In *Olenhouse v. Commodity Credit Corp.*, 42 F.3d 1560 (10th Cir.1994), however, the Tenth Circuit made clear that this is not how review of agency action under the APA works. When reviewing informal agency adjudication under the APA, the court should avoid relying on evidence outside of the administrative record. *See id.* at 1575; *SUWA v. Dabney*, 7 F.Supp.2d at 1206 n. 1. The court's review must be framed by the record that was before the administrative agency, not by evidence or arguments adduced by the litigants after the fact. *See Olenhouse*, 42 F.3d at 1575; *SUWA v. Dabney*, 7 F.Supp.2d at 1206 n. 1; *see generally* David Sive, "The Problem of the 'Record' in Judicial Review of Environmental Administrative Action," SD88 ALI–ABA 81 (1999). As the Seventh Circuit Court of Appeals explained,

> [i]n such a suit the district court is a reviewing court, like this court; it does not take evidence.... Not often, anyway. An evidentiary hearing in district court may be necessary to reconstruct the · agency's action or the grounds thereof, if the action and its grounds were not set forth in a written decision ..., though an even better response might be to stay the judicial review proceeding until the agency completed the record.... But here the agency embodied its decision and reasons in a substantial document. An evidentiary hearing in the district court might appear necessary if the agency had refused to allow the introduction of probative evidence. But the appearance is misleading. The proper judicial remedy in such a case is to order the agency to hold a proper hearing—not for the court to conduct the hearing itself.... In short, only in an emergency should a· reviewing court, whether a district court or any other federal court, conduct its own evidentiary hearing.

*Cronin v. United States Dept. of Agriculture*, 919 F.2d 439, 443–44 (7th Cir.1990) (citations omitted).

### IV. Burden of proof

■ "[T]he established rule [is] that land grants are construed favorably to the Government, that nothing passes except what is conveyed in clear language, and that if there are doubts they are resolved for the Government, not against it." *See Watt v. Western Nuclear, Inc.*, 462 U.S. 36, 59, 103 S.Ct. 2218, 76 L.Ed.2d 400 (1983), *quoting United States v. Union Pacific R.R. Co.*, 353 U.S. 112, 116, 77 S.Ct. 685, 1 L.Ed.2d 693 (1957). This principle applies to the determination of R.S. 2477 rights-of-way. *See United States v. Garfield County*, 122 F.Supp.2d 1201, 1225 (D.Utah 2000); *Fitzgerald v. United States*, 932 F.Supp. 1195, 1201 (D.Ariz. 1996) (doubt as to whether land was reserved for public use resolved in favor of government); *see also Adams v. United States*, 3 F.3d 1254, 1257 (9th Cir.1993) (doubt as to the scope of R.S. 2477 right-of-way resolved in favor of government); *Humboldt County v. United States*, 684 F.2d 1276, 1280 (9th Cir.1982)(same). The Counties, as the parties seeking to enforce rights-of-way against the federal government, therefore bear the burden of proving that their claimed rights-of-way are valid under R.S. 2477.

### V. Substantial Evidence

■ In order to be upheld by a federal district court, an administrative agency de-

termination must be supported by "substantial evidence" found in the administrative record as a whole. *See Olenhouse,* 42 F.3d at 1575. The administrative record in this case comprises several boxes of documents and evidence. The BLM's determination based on this record is laid out in three separate reports, one for the rights-of-way claimed by Garfield County, one for those claimed by San Juan County, and one for those claimed by Kane County. (*See* Admin. Determinations). Each report begins with a background section describing the process used for the agency's factfinding and the statutory construction of R.S. 2477 applied by the BLM. (*See, e.g.,* Admin. Determination for Garfield County at 1–4.) Each report then describes generally the types of evidence consulted by the BLM in reaching its determination. In each case, the BLM considered comment and evidence submitted by the public, comment and evidence submitted by the parties, field inspections, U.S. public land records, county construction and maintenance records, maps, aerial photography, public land survey system records, wilderness inventory records, BLM range and grazing files, BLM planning documents, and records from other federal agencies in making its determinations. (*See, e.g., id.* at 5–9.) The reports then consider each claimed right-of-way individually, discussing the evidence gathered with regard to that claim, the agency's evaluation of each form of evidence, and the agency's determination regarding the validity of the claimed ‚right-of-way considering all the evidence presented.

For example, in evaluating the validity of Garfield County's claim to the "Devil's Garden" right-of-way, the BLM noted that: (1) the site inspection revealed some indications of past use; (2) the claim did not appear on any map prepared by either BLM or the United States Geological Survey between 1886 and 1993; (3) the claim did not appear in aerial photographs taken between 1958 and 1993; (4) there are no relevant public land survey system records for the claim; (5) the claim was not identified in wilderness inventory records despite the fact that the area had been designated for wilderness study; (6) BLM range and grazing files offer no evidence proving mechanical construction of the claimed right-of-way; (7) BLM maintenance records do not indicate when the claimed right-of-way was constructed; (8) BLM planning documents from 1981 describe some roads but does not mention the Devil's Garden claim; (9) project records from the Federal Highway Administration, the Central Federal Lands Highway Division, and the Bureau of Public Roads do not mention the claim; and (10) letters from and interviews of members of the public indicated use only after the passage of FLPMA and that the claim did not lead anywhere in particular. (*See id.* at 33–37.) Based on this evidence, the BLM concluded that Garfield County had failed to establish that the Devil's Garden claim was constructed at a time when the federal lands were open for public use, and that the claim was therefore invalid under R.S. 2477. (*See id.* at 38.)

■ Having reviewed the administrative record with regard to each of the claimed rights-of-way in this case, the court concludes that the BLM's determinations were supported by substantial evidence. The amount and nature of the evidence presented in support of each of the BLM's determinations is certainly more than a mere scintilla, is sufficient to support the agency's conclusions, and is not outweighed by contrary evidence.

The Counties' only specific complaint about the BLM's factual findings concerns the BLM's treatment of public comments. In support of their claim that the rights-of-way in question were established before R.S. 2477 was repealed by FLPMA in

1976, the Counties provided BLM with a list of people who the Counties believed had direct knowledge of the origins of the rights-of-way. (*See, e.g.,* Garfield County Mailing List, attached as Ex. L to Admin. Determination for Garfield County.) According to the Counties, BLM did not do an adequate job of contacting these persons and ignored the comments of the people it did contact. The administrative record, however, suggests otherwise. The record reflects that BLM mailed a letter to every one of the persons listed by the Counties for whom a mailing address was either provided or discoverable by BLM. (*See, e.g.,* Letter from BLM of Sept. 17, 1998, attached as Ex. L to Admin. Determination for Garfield County.) That not every one of the persons contacted chose to respond can hardly be said to be the fault of BLM, and BLM is not required to compel testimony from disinterested persons as part of an informal adjudication. Some of the people contacted did respond to the BLM inquiry by sending in a letter explaining what they knew about the right-of-way in question. (*See, e.g.,* Statement of Sam Spencer, attached as Ex. L to Admin. Determination for Garfield County.) The BLM's final administrative report discusses each of the letters received. (*See, e.g.,* Admin. Determination for Garfield County at 37 (discussing comment from Sam Spencer)). In each case, the BLM concluded either that the comments did not indicate that actual physical "construction" had been performed to perfect the right-of-way, did not indicate that the right-of-way had been perfected before the repeal of R.S. 2477 in 1976, were contradicted by other comments, or were outweighed by other evidence. (*See, e.g., id.* at 37–38.) The court finds, based on review of the record before the administrative agency, that the BLM adequately considered the information provided by the Counties.

The court concludes that the BLM's administrative determinations regarding the rights-of-way claimed by the Counties in this case were not made in an arbitrary or capricious manner and are supported by substantial evidence in the administrative record. Accordingly, the court upholds the factual determinations made by the BLM with regard to the validity of the Counties' claimed rights-of-way under R.S. 2477.

## VI. *Statutory interpretation*

As noted above, R.S. 2477 states: "And be it further enacted, that the right of way for the construction of highways over public lands, not reserved for public uses, is hereby granted." R.S. 2477. In making its determination that many of the rights-of-way claimed by the Counties are not valid R.S. 2477 rights-of-way, the BLM relied on the DOI's interpretation of the meaning of the words of the statute. The Counties claim that BLM erred with regard to its interpretation of three statutory terms: "construction," "highway," and "not reserved for public uses."

### A. *"Construction"*

In its administrative determinations in this case, the BLM interpreted the term "construction" in R.S. 2477 to require some form of purposeful, physical building or improving.

> Some form of mechanical construction must have occurred to construct or improve the highway. A highway right-of-way cannot be established by haphazard, unintentional, or incomplete actions. For example, the mere passage of vehicles across the land, in the absence of any other evidence, is not sufficient to meet the construction criteria of R.S. 2477 and to establish that a highway right-of-way was granted.

Evidence of actual construction may include such things as road construction or maintenance records, aerial photography depicting characteristics of physical construction, physical evidence of construction, testimony or affidavits affirming that construction occurred, official United States Government maps with legends showing types of road, as well as other kinds of information.

(Admin. Determination for San Juan County at 5; Admin. Determination for Garfield County at 4–5; Admin. Determination for Kane County at 5.) The Counties assert that this is an incorrect interpretation of the statute, and that the term "construction" in R.S. 2477 requires only "continued use."

 It is a cardinal principle of statutory construction that a court's interpretation of a statute begins with the plain meaning of the statute's words. *Bates v. Runyon,* No. 95–5183, 1996 WL 532210, at *2 (10th Cir. Sept.19, 1996); *Robinson v. Shell Oil Co.,* 519 U.S. 337, 340, 117 S.Ct. 843, 136 L.Ed.2d 808 (1997). Webster's dictionary defines "construction" as "[t]he process or art of constructing; the act of building; erection; the act of devising and forming; fabrication; composition." WEBSTER'S REVISED UNABRIDGED DICTIONARY at "construction" (1996); *accord* WEBSTER'S NEW TWENTIETH CENTURY DICTIONARY 392 (2d ed.1979). BLACK'S LAW DICTIONARY similarly defines "construction" as "[t]he act of building by combining or arranging parts or elements; the thing so built." *Id.* at 308 (7th ed.1999). This ordinary meaning comports with the BLM's (and Plaintiffs') contention that "construction" requires some form of purposeful, physical building or improving, and that construction cannot be achieved solely by the effects of haphazard use. Although mechanical means for building highways has certainly changed since 1866, the date R.S. 2477 was enacted, the ordinary meaning of the word "construction" suggests that Congress in 1866 desired that R.S. 2477 rights-of-way be intentionally, physically worked on to produce a surface conducive to public traffic. *See* Michael Wolter, *Revised Statutes 2477 Rights–of–Way Settlement Act: Exorcism or Exercise for the Ghost of Land Use Past?* (hereinafter "Wolter"), 5 Dick. J. Envtl. L. & Pol'y 315, 331 (1996)(citing 59 Fed.Reg. 39,220 (1994)).

This reading is consistent with Congress's objectives for federal land use policy. Congress has specifically stated that determination of the validity of R.S. 2477 claims "should be drawn from the intent of R.S. 2477 and FLPMA." H.R. Conf. Rep. No. 102–5503 (1992); 138 Cong. Rec. H9306–01, at H9325 (1992); 1992 WL 237510. The intent of FLPMA is clearly stated by that statute:

(1) the public lands be retained in Federal ownership, unless as a result of the land use planning procedure provided for in this Act, it is determined that disposal of a particular parcel will serve the national interest; ...

(2) the national interest will be best realized if the public lands ... present and future use is projected through a land use planning process coordinated with other Federal and State planning efforts; ...

(10) uniform procedures for any disposal of public land ... be established by statute ...

43 U.S.C. § 1701(a)(1), (2), and (10). Each of these stated goals would be frustrated, however, were R.S. 2477 to be interpreted as the Counties propose—by a "continued use" standard determined by reference to state law. The first goal of FLPMA, that federal lands be governed in accordance with national interest, would be undermined if the interest of the various states, rather than the interest of the federal

government, governed the validity of R.S. 2477 rights-of-way. FLPMA's second goal, clear projection of present and future federal land use, could not be accomplished if the federal government could not rely on a single, clear standard for predicting the validity of potential R.S. 2477 claims. And FLPMA's tenth goal, the adoption of uniform procedures for the disposal of federal land, would be frustrated by determining R.S. 2477 grants by the vagaries of state law. *See* Wolter, 5 Dick. J. Envtl. L. & Pol'y at 330–331.

The BLM's interpretation of "construction" seems to have been applied by the Supreme Court in *Bear Lake & River Waterworks & Irrigation Co. v. Garland,* 164 U.S. 1, 17 S.Ct. 7, 41 L.Ed. 327 (1896). In *Bear Lake,* the Supreme Court interpreted Section 9 of the 1866 Mining Law, the sister statute to R.S. 2477 (R.S. 2477 was initially passed as Section 8 of the same law). Section 9 deals with rights-of-way for "the construction of ditches," just as R.S. 2477 deals with rights of way for "the construction of highways." R.S. 2339, 43 U.S.C. § 661 (prior to 1976 amendment). It is a "basic canon of statutory construction that identical terms within an Act bear the same meaning." *Reno v. Koray,* 515 U.S. 50, 55, 115 S.Ct. 2021, 132 L.Ed.2d 46 (1995); *accord Vectra Fitness, Inc. v. TNWK Corp.,* 162 F.3d 1379, 1383 (Fed.Cir.1998) ("[I]t cannot be presumed that the [same] term has two different meanings in these closely related statutes."), *citing United Sav. Ass'n v. Timbers of Inwood Forest Assocs.,* 484 U.S. 365, 371, 108 S.Ct. 626, 98 L.Ed.2d 740 (1988). The Court held in *Bear Lake* that,

in order to perfect a right-of-way for a ditch, "it is the doing of the work" and "the completion of the work" that is required. *Bear Lake,* 164 U.S. at 18–19, 17 S.Ct. 7. This suggests that the identical word "construction" in R.S. 2477 should also be interpreted as requiring purposeful, physical "work."

Also favoring the interpretation of "construction" applied by the BLM in this administrative adjudication is the longstanding interpretation of the DOI, the agency charged with enforcing R.S. 2477. Since at least 1980, the DOI has interpreted "construction" to require "the actual building of a highway, i.e., the grant could not be perfected without some actual construction." (*See* Ferguson Letter at 5, attached as Ex. 4 to Pls.' Reply. Mem. in Supp. of Mot. for Summ. J.)[3] Agency "interpretations contained in [informal formats] are 'entitled to respect'[,] ... but only to the extent that those interpretations have the 'power to persuade.'" *Christensen,* 529 U.S. at 586, 120 S.Ct. 1655. The court finds this interpretation persuasive not only because it comports with the ordinary meaning of the term "construction" and the stated intent of FLPMA, as discussed earlier, but also because it establishes a workable standard for determining when R.S. 2477 rights-of-way were perfected. As the DOI's opinion letter notes,

[t]he administrative difficulty of applying a standard other than actual construction would be potentially unmanageable. If actual use were the only criterion, innumerable jeep trails, wagon roads and other access ways—some of

---

**3.** *See also* DOI Proposed Rule for Interpretation of R.S. 2477, 59 Fed.Reg. 39216 (1994) (proposed Aug. 1, 1994): "Construction means an intentional physical act or series of intentional physical acts that were intended to, and that accomplished, preparation of a durable, observable, physical modification of land for use by highway traffic. Where State law, in effect on the latest available date, further limits the definition of construction, these limits also apply." *Id.* at 39225. This proposed rule was never adopted due to a congressional moratorium on the implementation of new R.S. 2477 rules and regulations. *See* Pub.L. 104–208 § 101(d), 110 Stat. 3009–200 (1996).

them ancient, and some traversed only very infrequently (but whose susceptibility to use has not deteriorated significantly because of natural aridity in much of the West)—might qualify as public highways under R.S. 2477.

(Ferguson Letter at 7, attached as Ex. 4 to Pls.' Reply Mem. in Supp. of Mot. for Summ. J.) It is unlikely that Congress would have intended that the term "construction" in R.S. 2477 be read in a way that might have rendered later attempts to determine what rights-of-way had been established nearly impossible.

In a recent decision, this court adopted the interpretation of "construction" applied by the BLM. In *United States v. Garfield County*, 122 F.Supp.2d 1201 (D.Utah 2000), the court referred to a 1982 DOI opinion letter when defining the phrase " 'construction' within the meaning of R.S. § 2477."

> Construction ordinarily means more than mere use ... [T]here must have been the actual building of a highway.... [W]e think such a road can become a highway within the meaning of R.S. 2477 if state or local government improves and maintains it by taking measures which qualify as 'construction'; i.e. grading, paving, placing culverts, etc.

*Id.* at 1227 n. 35; *see also Fitzgerald v. United States*, 932 F.Supp. 1195, 1204 (D.Ariz.1996) ("To perfect an R.S. 2477 claim, one requirement is that the offer made by the law must be accepted by *construction and use* and the acceptance must be made while the lands were unreserved from the public domain ...") (emphasis added).

The Counties, on the other hand, cite authority for the principle that "construction" of a right-of-way is accomplished by "continued use." Under Utah state law, an R.S. 2477 grant became a public highway through "continued use of the road by the public for such length of time and under such circumstances as to clearly indicate an intention on the part of the public to accept the grant." *Lindsay Land & Livestock Co. v. Churnos*, 75 Utah 384, 285 P. 646, 648 (1929) (citing cases from Colorado, Wyoming, Montana, and Oregon adopting same rule of construction); *accord Boyer v. Clark*, 7 Utah 2d 395, 326 P.2d 107, 109 (1958). While past interpretations by state courts are not binding on a federal court interpreting a federal statute, several federal courts have looked to this state interpretation for guidance. In *Sierra Club v. Hodel*, 675 F.Supp. 594 (D.Utah 1987), the court ruled that "[u]nder R.S. 2477, a right of way could be established by public use under terms provided by state law." *Id.* at 604. Since the *Hodel* decision in 1987, several federal district courts have adopted this state law "continued use" standard in the determination of R.S. 2477 claims. *See Barker v. Board of County Comm'rs of the County of La Plata, Colo.*, 49 F.Supp.2d 1203, 1214 (D.Colo. 1999) (citing *Hodel* ); *United States v. Jenks*, 804 F.Supp. 232, 235 (D.N.M.1992) (citing *Hodel* ), *aff'd in part, rev'd in part on other grounds*, 22 F.3d 1513 (10th Cir. 1994); *Adams v. United States*, 687 F.Supp. 1479, 1490 (D.Nev.1988) (citing *Hodel* ); *see also Shultz v. United States Dept. of Army*, 10 F.3d 649, 655 (9th Cir. 1993) (citing *Hodel* ), *withdrawn and superseded on rehearing*, 96 F.3d 1222 (9th Cir.1996).

The cases adopting the "continued use" standard, however, are distinguishable from the present matter. The more recent cases to adopt this standard reached that interpretation simply by citing back to *Hodel*, rather than through independent analysis of the competing interpretations of the word "construction." The *Hodel* case itself also seems to have reached its decision by citing to previous cases, rather than by analyzing the statutory meaning of the term "construction." In ruling that

state law would govern the establishment of R.S. 2477 rights-of-way, *Hodel* cited to two cases: *Wilkenson v. United States Dept. of Interior*, 634 F.Supp. 1265, 1272 (D.Colo.1986), and *United States v. 9,947.71 Acres of Land*, 220 F.Supp. 328, 335 (D.Nev.1963). The *Wilkenson* case looked to state law for the establishment of R.S. 2477 rights-of-way only because the parties to that case agreed to do so. *See Wilkenson*, 634 F.Supp. at 1272. And the *9,947.71 Acres* case appears to have been miscited. In *9,947.71 Acres*, the court held that a validly constructed R.S. 2477 road constituted private property for which the government must provide compensation following a taking. *See id.*, 220 F.Supp. at 337. The issue of whether "physical work" or "continued use" was required to perfect an R.S. 2477 right-of-way was not before and was never discussed by the court. Nevertheless, the language used by the court clearly indicates its view that physical work was required to perfect an R.S. 2477 right-of-way. In referring· to the road at issue in that case, the court mentioned that the road had been "built" and "laid out" through a meandering mountain pass and that "acts of the actual construction" had been necessary to create the road. *Id.* at 330, 331. The court referred to the creators of R.S. 2477 roads as "builders." *Id.* at 331. The court then cited several cases, including a United States Supreme Court case, for the principle that the "work" and "labor" performed on a mining road was to be considered part of the work done on the mine itself:

> Labor and improvements, within the meaning of the statute, are deemed to have been had on a mining claim ... When the labor is performed or the improvements are made for its development,—that is, to facilitate the extraction of the metals it may contain,—though in fact such labor and improvements may ... be at a distance from the claim itself.

*9,947.71 Acres*, 220 F.Supp. at 332–33, quoting *St. Louis Smelting & Refining Co. v. Kemp*, 104 U.S. 636, 655, 14 Otto 636, 26 L.Ed. 875 (1881); *accord id.* at 332, quoting *Doherty v. Morris*, 17 Colo. 105, 28 P. 85, 86 (1891) ("labor performed by the owner of a mine in constructing a wagon road thereto ..."); *Id.* at 333, quoting *Sexton v. Washington Mining & Milling Co.*, 55 Wash. 380, 104 P. 614, 616 (1909) ("the performance of this labor in the construction of a road ...").

Further, Plaintiffs are correct that the Tenth Circuit's decision in *Hodel* did not resolve the issue of what interpretation should be given to the word "construction" in R.S. 2477. The Tenth Circuit's decision in *Hodel* addressed only the *scope* of R.S. 2477 rights-of-way already found to have been established—it did not address the issue in this case, how R.S. 2477 rights-of-way are established in the first place. *See Sierra Club v. Hodel*, 848 F.2d 1068 (10th Cir.1988), *overruled on other grounds, Village of Los Ranchos De Albuquerque v. Marsh*, 956 F.2d 970, 973 (10th Cir.1992). The question of whether courts should look to the state law "continued use" standard to determine the existence of an R.S. 2477 right of way was not before the court. While the court expressly disagreed with a DOI opinion letter that put forth the "actual construction" standard used by the BLM, the Tenth Circuit made clear that one of its motivations for doing so was that the establishment of R.S. 2477 rights-of-way issue was not directly applicable to the scope of R.S. 2477 rights-of-way issue before the court.

> A second reading [of the DOI opinion letter] is that the Solicitor is stating that, as a matter of federal law, the use of the word 'construction' in R.S. 2477 imposes actual construction as a baseline requirement for *perfection* of a right-of-way, a requirement which state law can interpret but cannot disregard or emas-

culate.... This reading of the Solicitor's opinion does not help Sierra Club, however, as it speaks only to what is necessary to perfect an R.S. 2477 right, not the scope of such a right once perfected. Sierra Club does not dispute that an R.S. 2477 right-of-way for the Burr Trail was perfected before passage of FLPMA, even under an 'actual construction' standard for perfection.

*Hodel,* 848 F.2d at 1081 (emphasis added) (citation omitted).[4] And while the court did cite to a federal regulation suggesting that R.S. 2477 rights-of-way should be determined "in accordance with State laws," that citation was made in dicta as part of a background section, and the federal regulation cited had been repealed years before the court's decision. *See Hodel,* 848 F.2d at 1078, *quoting* 43 C.F.R. § 244.55 (1939), *renumbered and rewritten as* 43 C.F.R. § 2822.2–1 (1974) (repealed 1980).

On the balance, the court finds the "intentional physical labor" interpretation applied by the BLM to be the most persuasive. For the reasons discussed above, the court adopts this interpretation and finds that the BLM did not err in its interpretation of the statutory term "construction."

### B. "Highway"

According to the DOI's policy memorandum, "[a] highway [for purposes of R.S. 2477] is a road freely open to everyone; a public road." (Ferguson Letter at 8, attached as Ex. 4 to Pls.' Mem. in Supp. of Mot. for Summ. J.) The BLM applied this definition in making its determinations in this case.

The claimed highway right-of-way must be public in nature and must have served as a highway when the underlying public lands were available for R.S. 2477 purposes. It is unlikely that a route used by a single entity or used only a few times would qualify as a highway, since the route [must have] open public nature and uses. Similarly, a highway connects the public with identifiable destinations or places. The route should lead vehicles somewhere, but it is not required that the route connect to cities. For example, a highway can allow public access to a scenic area, a trail head, a business, or other place used by and open to the public. Routes that do not lead to an identifiable destination are unlikely to qualify.

(Admin. Determination for San Juan County at 5; Admin. Determination for Garfield County at 5; Admin. Determination for Kane County at 6.) The court finds this interpretation by BLM to be both reasonable and persuasive and therefore gives some deference to the agency's construction of the statute.

The Counties' objection to the BLM's interpretation of the word "highways" does not address the notion that highways must be open to public use, but rather centers around the Counties' belief that "highways" can be formed by the passage of wagons, horses, or pedestrians. (*See* Counties' Mem. in Opp. to Mot. for Summ. J. at 12.) This appears to be a continuation of the Counties' argument concerning the statutory interpretation of the term "construction," as discussed above, rather than an argument concerning the statutory interpretation of the term "highways." Moreover, the court finds the BLM's inter-

---

4. The court's holding should not be read as an indication that it is impermissible to look to state law to interpret the meaning or requirements of R.S. 2477. Although state law can be used to help interpret the words of R.S. 2477, it cannot be used to "disregard or emasculate" the statutory terms. *Hodel,* 848 F.2d at 1081. The "continued use" interpretation of the statutory term "construction," however, does just that—it disregards the congressional intent behind R.S. 2477 and sets a lower standard for the establishment of rights-of-way over federal lands than the one intended by Congress.

pretation of the term "highways" to be persuasive and therefore gives some deference to the agency.

Accordingly, the court finds that BLM did not err in its interpretation of the term "highways" in R.S. 2477.

### C. "Not reserved for public uses"

As the text of the statute indicates, R.S. 2477 permits the establishment of rights-of-way over "public lands" only if the land was "not reserved for public uses." An R.S. 2477 right of way may be created only while the "surrounding land [retains] its public character." *Adams. v. United States*, 3 F.3d 1254, 1258 n. 1 (9th Cir. 1993); *see also Humboldt County v. United States*, 684 F.2d 1276, 1281 (9th Cir. 1982). The BLM based its determinations in this case, in part, on its finding that the Counties had made their claimed right of way at a time when the land *was* reserved for public uses and therefore not susceptible to R.S. 2477 right-of-way claims. The Counties challenge the BLM's determination as to "Coal Land Withdrawal No. 1," a 1910 reservation of public land in Utah on which the BLM relied in finding that Garfield County's Cedar Wash, Right Hand Collet, and Devil's Garden claims were not valid rights-of-way under R.S. 2477.

The reservation of public land in question, Coal Land Withdrawal No. 1, was promulgated as part of the Pickett Act of 1910. The Pickett Act gave the President of the United States the authority to "at any time in his discretion, temporarily withdraw from settlement, location, sale, or entry any of the public lands of the United States ... and reserve the same ..." *See* Act of June 25, 1910, ch. 421, § 1; 36 Stat. 847. The Pickett Act's withdrawal of public lands was, however, subject to certain exceptions. The second section of the Pickett Act provided that "all lands withdrawn under the provisions of this Act shall at all times be open to exploration,

discovery, occupation, and purchase, under the mining laws of the United States, so far as the same apply to minerals other than coal, oil, gas, and phosphates ..." *See id.* at § 2. The Counties argue that, since R.S. 2477 was initially passed "under the mining laws of the United States," R.S. 2477 falls under this exception to the Pickett Act's withdrawal of public lands.

This withdrawal exception, however, was not applicable to all mining laws, but only those mining laws that applied "to minerals other than coal, oil, gas, and phosphates." *Id.* In 1912, Congress amended the Pickett Act to clarify this point—the amended Act stated that the exception applied only to mining laws "so far as the same apply to metalliferous minerals." Act of Aug. 24, 1912, c. 369 § 2; 37 Stat. 497; *accord* DOI Letter to Regional Land Offices, 49 Pub. Lands Dec. 95, 1912 WL 1359, at *1 (DOI Oct. 12, 1912) ("[T]he lands embraced in such orders of withdrawal ceased to be and are not open to exploration, discovery, occupation, or purchase under the mining laws of the United States, except for metalliferous minerals.") R.S. 2477, however, is not a mining law dealing specifically with metalliferous minerals, but rather a broad grant of entry onto federal land for nearly any purpose. R.S. 2477, therefore, does not fall under this exception to the reservation of federal lands for public use.

Had Congress wished R.S. 2477 to be among the statutes excepted from the withdrawal of public lands, it certainly knew how to do so. Three days before the passage of the Pickett Act, Congress also limited the Pickett Act's reservation of public lands with the following statute:

[F]rom and after the passage of this Act unreserved public lands of the United States exclusive of Alaska which have been withdrawn or classified as coal lands, or are valuable for coal, shall be

subject to appropriate entry under the homestead laws by actual settlers only, the desert land law, to selection under ... the Carey Act, and to withdrawal under ... the Reclamation Act ..."

Act of June 22, 1910, ch. 318, 36 Stat. 583 (emphasis added). This list of statutes specifically excepted from the Coal Withdrawal does not include R.S. 2477, and it gives no indication that Congress desired the unrestricted entry onto reserved federal lands that an exception for R.S. 2477 would have created.

The Ninth Circuit Court of Appeals's decision in *Humboldt County v. United States*, 684 F.2d 1276 (9th Cir.1982), supports this reading. *Humboldt County* involved a claimed R.S. 2477 right of way to Nevada's Blue Lake. In 1934, the President, acting pursuant to the Pickett Act, had withdrawn the land surrounding Blue Lake from "settlement, location, sale, or entry." *Id.* at 1281. The court determined that this withdrawal of public lands rendered the county unable to claim R.S. 2477 rights-of-way during this time period. *See id.* Although it did not state it expressly, therefore, the court implicitly found that R.S. 2477 was not exempt from the Pickett Act's reservation of public lands.

Accordingly, the court agrees with the BLM determination that R.S. 2477 rights-of-way could not have been established during the time that federal land was "reserved for public use" by the Coal Land Withdrawal No. 1.

For the reasons stated above, the court finds the BLM's statutory interpretation of R.S. 2477 to be both reasonable and persuasive and concurs with the BLM interpretation.

## VI. BLM's Administrative Process

The Counties also argue that the BLM administrative determinations should be overturned due to alleged flaws in the adjudication process. Specifically, the Counties assert that the BLM informal adjudication should be overturned because it: (1) was a biased decision from a non-neutral factfinder; (2) did not sufficiently inform the Counties of the evidentiary and legal standards that would be employed; and (3) did not give the opportunity for live testimony or oral argument.

### A. BLM Bias

 The Counties argue that the BLM adjudication was biased due to the BLM's role as a party to this lawsuit. According to the Counties, the BLM determination must have been geared toward defending the United States' litigating position in this case. But district court review of informal agency action, which are commonplace, nearly always involve an agency arguing that its own findings should be upheld. The Counties have not introduced any evidence suggesting that this situation is any different from a routine review of informal agency action. The Counties' allegation is also belied by the administrative record in this case, which appears to be quite thorough. The BLM's process included public notice and comment and review of many sources of evidence; the completed administrative record fills more than thirteen boxes. The thoroughness of the BLM's factual review suggests that the BLM's determination was not simply a rubber stamp of the United States' litigating position. Moreover, as discussed above, the BLM determination was supported by substantial evidence. Were the BLM to have made arbitrary factual findings due to any alleged bias, it would be apparent on review. The court does not find here that the BLM's administrative determinations were arbitrary or capricious.

### B. Insufficient Notice of Evidentiary and Legal Standards

 The Counties contend that the BLM failed to provide them sufficient no-

tice of the evidentiary and legal standards that would be employed by the BLM in its informal adjudication. With regard to notice of evidentiary standards, the Counties claim that the BLM "failed to state [before the adjudication] ... that the Counties would be foreclosed from further evidentiary presentation if they did not present evidence in the full manner typical of a hearing or trial ..." (Counties' Mem. in Opp. to Mot. for Summ. J. at 22.) The record reflects, however, that the Counties were fully informed of their need to present any and all evidence to the BLM if they wished it to be considered as part of the agency's determination. On June 22, 1998, the BLM mailed letters to the Counties explaining that the BLM would soon be making "administrative determinations as to the existence and scope of certain rights-of-way at issue in [this] case." (Letters from BLM to Garfield, San Juan, and Kane County Commissioners, attached as Ex. 3 to Pls.' Reply Mem. in Supp. of Mot. for Summ. J.) These letters specifically state that

> we ask that you provide us with any and all information or evidence (i.e., documents, maps, etc.) believed to be relevant to the validity or scope of the R.S. 2477 claims. The information will be used by the Bureau of Land Management to make recommendations to the Secretary of the Interior as to the validity and scope of the claimed rights-of-way.... We request the information by August 24, 1998 so that we can complete the review process ...

(Id.) (emphasis added) On February 12, 1999, the BLM again notified the Counties that

> [t]o the extent that you have any information that may be relevant to the administrative determinations, we urge you to timely provide it to the BLM no later than the close of the public comment period after publication of draft recommendations by the BLM. This will

insure [sic] that the administrative determinations of BLM and DOI are based upon the most complete record possible. We look forward to receiving any additional information you may have.

(Letter from BLM to Garfield, San Juan, and Kane County Commissioners, attached as Ex. 4 to Pls.' Reply Mem. in Supp. of Mot. for Summ. J.) Furthermore, when a district court reviews an informal agency action, the administrative record upon which the agency based its decision forms the basis for the court's review. *See Olenhouse,* 42 F,3d at 1575; *SUWA v. Dabney,* 7 F.Supp.2d at 1206 n. 1. Based on these facts, the Counties had sufficient notice that they were required to submit any and all evidence they felt relevant to the BLM's determination to the BLM for consideration as part of the informal adjudication process.

The Counties also assert that they were not made aware of the legal standards—specifically the statutory interpretation and the burden of proof—which the BLM would employ in assessing their claims. The BLM's interpretation of the terms of R.S. 2477, however, was first published in a 1980 DOI opinion letter, 16 years before the start of this litigation. (*See* Ferguson Letter, attached as Ex. 4 to Pls.' Mem. in Supp. of Mot. for Summ. J.) Similarly, the principle that the party claiming access to federal land bears the burden of proof has been established for decades. *See United States v. Union Pacific R.R. Co.,* 353 U.S. 112, 116, 77 S.Ct. 685, 1 L.Ed.2d 693 (1957); *Watt v. Western Nuclear, Inc.,* 462 U.S. 36, 59, 103 S.Ct. 2218, 76 L.Ed.2d 400 (1983). The Counties thus had sufficient notice of the legal standards which BLM applied during the adjudication.

*C. Lack of Opportunity for Live Testimony and Oral Argument*

 Finally, the Counties contend that the BLM should have afforded them the opportunity to present live witnesses

and to make oral argument. "The Supreme Court has not interpreted the [Due Process Clause of the] Fifth Amendment as guaranteeing any particular form of procedure" for all administrative determinations. *NLRB v. Allied Distrib. Corp.*, 297 F.2d 679, 680 (10th Cir.1961). Due process does not require oral argument and live witness testimony for all agency adjudications. *See FCC v. WJR, The Goodwill Station*, 337 U.S. 265, 274–75, 69 S.Ct. 1097, 93 L.Ed. 1353 (1949). The rigid hearing procedures requested by the Counties are required by the APA only when "required by statute to be determined on the record after opportunity for an agency hearing." 5 U.S.C. § 554. "In instances where the relevant statute does not require that adjudicatory decisions be made 'on the record after opportunity for agency hearing,' the APA as such provides no procedures that must be followed." STEPHEN BREYER ET AL., ADMINISTRATIVE LAW AND REGULATORY POLICY 567 (4th ed.1999). For example, where the statute does not require formal adjudication procedures, the grant or denial of oral argument is left to the discretion of the agency. *See Allied Distrib. Corp.*, 297 F.2d 679, 680 (10th Cir.1961). The non-inclusion of oral argument or live witness testimony as part of the BLM's adjudication procedures did not represent a violation of due process rights.

Accordingly, the court concludes that the BLM's administrative process did not violate due process.

### Order

The BLM's determinations regarding the validity under R.S. 2477 of the rights-of-way claimed by the Counties are AFFIRMED.